[Crim. No. 1321. Fourth Dist. July 26, 1957.]

THE PEOPLE, Respondent, v. RAY LEWIS, Appellant.

Myers, Martin & Leedy for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with driving a vehicle while under the influence of liquor resulting in bodily injury, in violation of section 501 of the Vehicle Code. In the second count he was charged with manslaughter in violation of subdivision 3(b) of section 192 of the Penal Code. A jury found him guilty on both counts also finding, with reference to Count 2, that the act causing death was without gross negligence. An order was entered suspending the imposition of sentence and placing the defendant on probation for five years with the conditions that he be confined for six months in the detention facility of San Diego County, that his driver's license be surrendered for revocation, and that he should not operate a motor vehicle on public highways until authorized to do so by the Department of Motor Vehicles. He has appealed from this "judgment," and from an order denying a new trial.

About 4 p. m. on October 21, 1956, an automobile driven by the defendant collided with one driven by Mrs. White at the intersection of Highway 101 with Fulvia Street in Leucadia. Highway 101 at that point has four lanes, two for northbound traffic and two for southbound traffic. Mrs. White, who was driving south on 101, pulled into a special left-turn lane preparatory to turning east into Fulvia Street. She waited about one minute, allowing several cars to pass, and then proceeded across the northbound lanes of 101. As she was in the westerly of the northbound lanes she saw the defendant's car "coming very fast" from the south in the westerly of the northbound lanes. She thought she had time to get across "because it was so far from me," and she proceeded into the easterly of the northbound lanes. The defendant's car swerved to the right, skidded, and struck Mrs. White's car, the collision occurring in the easterly of the northbound lanes. Mrs. White was slightly injured and an-

other woman riding with her was killed. The defendant and two others in his car were also injured.

A man, who was also in the left-turn lane waiting to turn east on Fulvia, testified that as the defendant's car came into view 2/10th of a mile down the road, Mrs. White's car began to move and as she started across the northbound lanes the defendant's car was from 200 to 250 feet from the intersection; that defendant's car was traveling between 50 and 60 miles per hour; and that as soon as Mrs. White started across the traffic lane the defendant applied his brakes and his car twisted and struck Mrs. White's car broadside. The posted speed limit in this area was 45 miles per hour. A lady who was standing on the corner of this intersection testified that she saw Mrs. White stop in the "safety zone" and wait to make a left turn; that she could see no cars coming north when Mrs. White started to cross; that the road was clear to a bend on the road, which was 2/10th of a mile away; and that as the defendant approached he put on his brakes and his car went out of control, swerved to the right and struck Mrs. White's car.

The defendant was taken to the naval hospital at Camp Pendleton and an employee of the hospital, who was ordered to do so, removed a sample of blood from the defendant's arm which he put in a sealed glass tube and delivered to one Armas, a laboratory technician in the Navy, who was then in charge of that work in the hospital. Armas ran a Bogans test on the blood sample. The result of this test was entered on the hospital records. A criminologist of the San Diego Police Department testified that this test indicated ".222% blood alcohol per cubic centimeter or per 100 centimeters"; that from .10 to .15 per cent most persons would be under the influence of alcohol; that persons whose blood contained .15 per cent and above would all be under the influence of alcohol; and that .222 per cent falls into this last category.

There was a great deal of evidence concerning the drinking done by the defendant and his two companions, Taggert and Butler, on that day. Taggert testified that about 10 o'clock that morning, before they left Camp Pendleton, a number of them were drinking from a bottle of whiskey and he saw the defendant take "at least" one drink; that he, Butler and the defendant left in the defendant's car, in which the defendant had two six-packs of beer; that they went to a golf course where the defendant gave two beers to a buddy and "we was drinking one at the time"; that they then went to

another place and the defendant gave another buddy a couple of bottles; that they then went to a beer hall in town where they stayed about an hour and had ''a few beers''; that he did not remember how many beers they had, but it was more than three apiece; that they then went to another beer bar where ''we drank a beer, one or two''; that they then went to another place where he drank a beer but he could not remember whether the others did or not; that they then went to another place where he and Butler drank a beer; that the defendant was in another room and he did not know whether he had anything to drink; that they left there about 4 p. m. and started north on 101; and that the next thing he remembered was ''when Lewis hit the brakes, I looked forward, naturally, and we hit.'' He further testified that he, Butler, the defendant, and two others drank the two six-packs; that he did not count the number of bottles the defendant drank that afternoon; that he himself drank 12 to 14, or maybe 20, bottles of beer during the day; and that he believed he ''was a little ahead of'' the defendant.

Butler's testimony was largely to the same effect as that of Taggert. The defendant testified that he did not drink anything on most of these occasions; that he drank one and a half bottles of beer when they arrived at the first place in town; that his total alcoholic consumption for the day was three and a half beers; that he was unable to explain the results of the Bogans test given him; and that ''If it was there, I don't know how it got there.'' The defendant's brother, sister and another man who saw him during that afternoon testified that in their opinion he was not then under the influence of liquor.

 The appellant first contends that the evidence is insufficient to support the verdict and judgment. With respect to the first count, it is argued that there was no evidence that he did any act forbidden by law; that there was no evidence that he violated the basic speed law; and that there was no evidence of any other act forbidden by law, committed by him, which could have been a proximate cause of an injury to another person. There was ample evidence that the defendant was driving while under the influence of intoxicating liquor, that he violated the basic speed law, and that he failed to yield the right of way at this intersection, and to support the jury's implied finding that one or more of these violations was a proximate cause of these injuries to other persons. Whether or not the act of Mrs. White in suddenly crossing

the lane in which the defendant was traveling was the sole proximate cause of the accident was a question for the jury. With respect to the second count, it is argued that the defendant was not guilty of negligence in any degree; that in order to sustain a conviction for a violation of section 192, subdivision 3(b), of the Penal Code the evidence must show that the defendant acted other than as a reasonably prudent man would have acted in the same circumstances; and that the evidence shows that the defendant acted as prudently as possible when Mrs. White made a left turn in front of his car while he was from 200 to 250 feet from the intersection. Section 192, subdivision 3(b), includes the phrase ''in the commission of an unlawful act, not amounting to felony, without gross negligence.'' There was sufficient evidence of unlawful acts of the defendant in driving while under the influence of liquor, in violating the basic speed law, and in failing to yield the right of way. The evidence was sufficient to support the conviction on both counts.

It is next contended that the court erred in admitting, as expert testimony, the testimony of a witness not qualified to testify as an expert. It is argued that Armas was allowed to testify as an expert witness; that the only evidence tending to qualify him as an expert was that he had a Navy rating of HM 1st Class and had worked in the laboratory at Camp Pendleton for six years; and that the People's expert chemist testified that he would not be able to tell whether or not such a person was qualified to run a Bogans blood test. There was evidence that Armas was a 1st Class hospital corpsman with six years' experience in this hospital, that the making of such tests was a part of his work, and that he ran the Bogans test on the sample of the defendant's blood. A hospital record showing that this test was run, signed by Armas and by a doctor, was also admitted in evidence. The only objection made to the testimony of Armas was that, in the absence of a showing that this blood was taken from the defendant with his consent, this taking of blood would constitute unlawful search and seizure and violate his constitutional rights. Armas did not express any opinion on the result of the test but merely testified as to the facts in connection with what he had done. He was a laboratory technician, had worked there six years, and was on duty as such technician for that night. The evidence indicates that he was fully qualified to do that work and there was no evidence to the contrary. The expert witness referred to by the appellant was asked whether he

thought "a person who had six years experience in a laboratory could run an accurate test," and he replied that he could not answer for the reason that he did not know what the person's duties were, that "If he were dealing with this particular thing, blood tests, he definitely could run a good blood test after six years experience," and that "in order to be a technician and take this blood test, you don't have to have a doctor's degree," or a science degree.

■ It is next contended that the court erred in admitting in evidence any testimony relative to a blood test of the defendant since this sample was taken while the defendant was unconscious, and his constitutional rights were thus violated. This contention is sufficiently answered by the decision in *People* v. *Duroncelay*, 48 Cal.2d 766 [312 P.2d 690]. A further consideration is that there was here sufficient evidence of intoxication if this evidence of a blood test had not been admitted.

■ It is claimed that the district attorney was guilty of misconduct during his argument to the jury, in going outside of the evidence and making statements for the purpose of inflaming the passions and prejudice of the jury. The statements referred to were to the effect that effective safety on the highway was a matter within the province of the jury; that if anything is going to prevent the slaughter on the highways it has got to be juries who adopt a proper frame of mind toward accidents of this nature; and that if people who have been drinking to the degree that the evidence shows this person had been drinking are allowed to go out on the highways "with you and your families and your children and people you know," and these results are allowed to follow, what are the jurors going to say about it. It may be conceded that these statements should not have been made. However, in view of the evidence in the case, it does not reasonably appear that they could have had any controlling effect upon the verdict, and it should not be held, under the circumstances shown by the record, that they were so prejudicial as to require a reversal.

Neither error nor prejudice appears in connection with two other contentions, that the court improperly commented on the facts of the case in what purported to be instructions upon the law, and that an instruction given in one specific connection conflicted with other instructions on manslaughter which, as is admitted, correctly stated the law.

■ It is contended that the court erred in striking the

testimony of a character witness produced by the defendant. This witness was an officer who testified that the defendant had been under his command for about a year, that he had never heard the defendant's reputation for sobriety discussed, and that he had never heard anything bad about the defendant's reputation so far as sobriety is concerned. When it was brought out on cross-examination that this witness had never heard anything about the defendant's activities except while he was on the base the testimony was stricken. The defendant's reputation for sobriety while he was on the base would probably and naturally be good, the officer admitted, in effect, that he knew nothing about it, and it cannot reasonably be supposed that the striking of this from the record could have affected the verdict.

Finally, it is contended that the court erred in instructing the jury, in referring to this kind of manslaughter, that to constitute such a crime any unlawful act not amounting to a felony must be done with either negligence, gross negligence or criminal intent; and then instructing the jury on the meaning of gross negligence without also instructing them on what constitutes ordinary negligence. Under the statute it was only necessary to show the commission of an unlawful act not amounting to a felony, without gross negligence, and the instruction given clearly defined the meaning of gross negligence. The evidence showed such an act or acts, and the jury so found. No instruction on ordinary negligence was requested, and the failure to give such an instruction was neither erroneous nor prejudicial.

No errors appear which are sufficient to justify or require a reversal, and the record discloses that the defendant had a fair trial and that he received a light punishment in view of the circumstances shown by the evidence.

The judgment (order granting probation) and the order denying a new trial are affirmed.

Griffin, J., and Mussell, J., concurred.